OPINION
In September 1999, Carl E. Papalevich was indicted by a Franklin County grand jury, charging him with nine counts: a single count of aggravated burglary; two counts each of aggravated robbery and kidnapping; and, four counts of robbery. In addition, all counts contained firearm specifications. The indictment arose as a result of an alleged September 12, 1999 break-in at the home of Sandra Dailey on Martin Avenue in Columbus, Ohio. The other named victim was Sam Swanson, a renter at Ms. Dailey's home. This case was a retrial; the first trial ended with a hung jury.
This second jury trial commenced in December 2000. The jury ultimately acquitted Mr. Papalevich on the most serious charges, aggravated burglary and the two aggravated robberies. In addition, the jury acquitted him of having or using a gun. However, the jury returned guilty verdicts as to the six remaining charges two counts of kidnapping and four counts of robbery.
The trial court sentenced Mr. Papalevich to prison terms of six years on each kidnapping charge and ordered them to be served consecutively to each other. The court merged the four robbery charges into two, imposed terms of three years and five years, respectively, and ordered the robbery sentences to be served concurrently with the sentences ordered on the kidnapping convictions. Thus, Mr. Papalevich was effectively sentenced to a combined total term of twelve years.
Carl E. Papalevich (hereinafter "appellant") has timely appealed, assigning five errors for our consideration:
 Assignment of Error I Appellant was denied effective assistance of counsel as said counsel repeatedly failed to object to leading questions and legal conclusions by the prosecutor, by failing to move to dismiss the kidnapping counts pursuant to R.C. 2941.25, by allowing a portion of a key state witness' testimony to be sent back to the jury during deliberations, by failing to object to [the] prosecutor improperly vouching for the credibility of a state's witness, by allowing the state to inflame the passions of the jury and by stating in closing argument that appellant was involved in the crime.
 Assignment of Error II The trial court commits reversible error by denying defendant's [Crim.R.] 29 motion on the charge of kidnapping and then sentencing defendant on said charge, when there was no separate animus from aggravated burglary or robbery to support such a conviction.
 Assignment of Error III The trial court commits reversible error by allowing an incompetent person to testify.
 Assignment of Error IV The trial court commits reversible error by giving a portion of the trial transcript of a key witness for the state to the jury during deliberations, in violation of R.C. 2945.35 and appellant's right to a fair trial under the state and federal constitutions.
Assignment of Error V
 The judgment of maximum consecutive sentences for each count of conviction was in violation of statutory sentencing mandates.
The record before us reveals the following facts surrounding the September 12, 1999, incident at the Martin Avenue residence of Sandra Dailey. Ms. Dailey resided there with her two sons, Jimmy and Kenneth Carver. Appellant, also known as "Little Ed" or "Eddie," and his family were neighbors of Ms. Dailey. Appellant and his younger brother, Phillip, are close to the same age as Ms. Dailey's sons. The record indicates that appellant was approximately nineteen years of age at the time of trial.[1]
The state's most significant witnesses were the alleged victims of the kidnapping and robbery, Sandra Dailey and Sam Swanson.
Sandra Dailey testified that at the time of the incident, appellant, "Little Ed," lived across the street from her with his mother, Joyce. Appellant's brother, Phil, also lived there "part time." Along with Ms. Dailey's two sons, a man named Sam Swanson also resided in the Dailey home; he paid rent of $100 per week to her to sleep on her couch and for meals. Prior to living at her home, "Sammy" had lived with appellant's family across the street.
Ms. Dailey described Mr. Swanson as being black and about thirty-five years old. Mr. Swanson worked at the nearby Florentine restaurant, as did two of Ms. Dailey's brothers.
Sandra Dailey testified that she was awakened in her upstairs bedroom at approximately 5:00 a.m. on September 12, 1999, "with a gun being pointed" at her. She did "not actually" see who was holding the gun. She heard a voice, woke up, and yelled "`Who is it?'" According to Ms. Dailey, "he yelled out his little brother's name." The prosecution then attempted to clarify Ms. Dailey's testimony. (Tr. 36-37.)
Ms. Dailey recalled being awakened by "Sammy" calling out her name, in a "scared" tone of voice, telling her to wake up. She "knew he [Sammy] was by [her] bedroom door." She responded by asking "'[w]ho is it?'" Then, "[t]he kid yelled out his brother's name." The prosecution asked, "[w]hat is Little Ed's brother's name?" Ms. Dailey responded, "Phillip." (Tr. 38-39.)
Ms. Dailey clarified that although she knew "Sammy" Swanson's voice, she had to ask who it was because there was a "commotion going on" and she "didn't know what was going on yet." Although "it was dark" and she "just woke up," she "could see there was more than one person in the shadows." There was no night light in her room or the hallway, and she could not remember whether the room was "illuminated at all by the street lights outside." However, a "bathroom light was on down the hall" and she was somewhat able to see the hallway. (Tr. 39-40.) She was sure, however, that appellant, "Little Eddie" was with another unknown intruder.
According to Ms. Dailey, she "knew right away" that someone else was there with Sam Swanson "because Sammy was laying by the floor there with a gun to his head." "Sammy" said, "`Sandy, give them what they want, he's got a gun." The man's voice did not sound like Phillip's voice; she recognized it as appellant's. She again recognized appellant's voice when he said, "`I need some money, bitch, or give me some money, bitch.'" (Tr. 41-43.)
Ms. Dailey reached into her purse and pulled out a $5 bill. That was the sum total stolen during the alleged robbery. Ms. Dailey could not "even remember if it was Sammy or someone else" who took the $5 bill from her. Someone had to retrieve it from her while she lay in bed, since she slept in the nude. However, she still could not recall who actually took the money from her hand. Although she initially believed that she pulled out a $20 bill, somehow "Sammy" knew that it was actually just a $5 bill.
According to Ms. Dailey, her two sons slept through the entire ordeal even though their bedrooms were upstairs fairly close to hers. (Tr. 45-47.) However, according to Ms. Dailey, she later figured out that the intruders also stole a Nintendo game, which had been in the bedroom of one of her sleeping sons. The paddles to this game were later discovered outside in the backyard, after the police had come and gone.
After the intruders left, Ms. Dailey was finally able to awaken one of her sons. They went downstairs, but saw nothing in disarray to suggest that the intruders might have rifled through their belongings. However, the "back door was kicked in." Since she had no telephone, Ms. Dailey left after "probably 10 minutes" to go to her neighbor's house to phone the police. When the police arrived, Ms. Dailey told them that appellant was one of the perpetrators. (Tr. 54-55.)
On cross-examination, Ms. Dailey reiterated that her sons slept through the ordeal: the back door being kicked in; "Sammy" being forced upstairs where all the bedrooms were and exchanging yells with the intruders; "Sammy" and "Little Eddie" yelling at her from the doorway to her room; and, the ruckus created during and after her handing over the $5 bill.
Ms. Dailey acknowledged that she had no direct income of her own at the time of the alleged incident; her monthly rent of $400 was "basically" paid by "Sammy," her renter. She was not employed at the time, but did benefit from some from her sons' Social Security benefits. Her sons also had jobs.
On cross-examination, Ms. Dailey could not explain why the incident occurred at approximately 5:00 a.m., and, according to police records, she apparently waited until at least 6:30 a.m. to call the police. (Tr. 64-65.)
Ms. Dailey admitted on cross-examination that she "sometimes" kept large sums of money in her purse. In addition to "almost a thousand dollars a month social security from [her] two sons," and the $400 monthly from Sammy, she also "used to sell weed." (Tr. 71.)
The state's next witness was Sam Swanson. A few preliminary questions by the prosecution in the nature of basic background, including Mr. Swanson's education, readily revealed his mental challenges. Accordingly, the trial judge conducted a brief examination of Mr. Swanson, and quickly determined him to be competent to testify. The competency issue is more fully developed below in our discussion of the relevant assignments of error.
Sam Swanson testified regarding his recollection of the incident. Following several objectionably leading questions, Mr. Swanson finally recalled being awakened by "a red laser thing" pointed at him. When the prosecution asked him about "when the house was robbed," Swanson indicated that "Ed [appellant] and two more other guys" were the culprits. Mr. Swanson had never seen the two others before or after the incident. When asked to describe what "Ed" was wearing, Swanson replied, "Clothes." (Tr. 98-99.)
Mr. Swanson described what he heard as "walking feet." The court, "allow[ing] a little latitude" for the prosecution, permitted the prosecution to ask numerous leading questions regarding the details of what Swanson witnessed. Swanson testified that, "[t]here was no key. It was like a knife or something." However, the noise was only loud enough that he could hear it "a little bit, not all the way." When asked if "anybody [had] a gun," Swanson answered, "No, sir, just Ed." He pointed the gun at Swanson. (Tr. 100-102.)
"Ed" told Swanson to "`get up and get the money from Sandy.'" They went upstairs and got the money from Sandy "five bucks." Contrary to the prosecution's leading question, Mr. Swanson denied that it was "pretty dark." He could tell that Ms. Dailey ("Sandy") only gave him a $5 bill. (Tr. 103-105.)
Mr. Swanson testified that he woke Sandy by exclaiming, "`Sandy, there's a robbery in my house. Ed and his two other boys broke in the house, broke in the house, stole, rampaged the house.'" "The frontroom was all trashed and everything," according to Swanson, contrary to Ms. Dailey's testimony that the downstairs did not appear to have been disturbed. Also in conflict with Ms. Dailey's testimony regarding her sons sleeping throughout the incident, Mr. Swanson recalled that "JJ," one of Sandy's sons, "went downstairs trying to catch Ed" right away. (Tr. 105-109.) Mr. Swanson was sure that it was "Ed" who he saw that night.
On cross-examination, defense counsel impeached Mr. Swanson with his testimony at the first trial in this matter. After being shown a transcript of his previous testimony, Mr. Swanson acknowledged that he had denied ever seeing a gun. He also testified that "Ed" never pointed a gun at Sandy. (Tr. 112-115.)
Columbus Police Officer Richard Stevens was dispatched to the scene that morning. Although a prosecution witness, the officer testified that Ms. Dailey informed him that she "never saw who broke into her house." Further, Mr. Swanson never mentioned anyone "throwing a gun," as Swanson had alluded to in his earlier testimony; nor did Swanson mention anything about a "laser pointer." (Tr. 127-128.)
The state's final witness was Jimmy Lee ("JJ") Carver, Jr., Ms. Dailey's son, who did not add much substantive information. His testimony only served to contradict Mr. Swanson's testimony insofar as Carver concurred with his mother that he (Carver) slept through the entire incident. Carver added, however, that after the police left, he did find pieces of the Nintendo game outside in the backyard area. It appeared to have come from his brother's room, the brother who had also slept through everything.
On cross-examination, JJ Carver acknowledged that appellant, "Ed," had beaten him up "pretty good" when they were younger. Carver also knew that "Ed's" brother Phillip "is well known, him and Little Ed * * * for [doing] drugs." However, Carver never personally witnessed either "Ed" or Phillip doing drugs. Carver also never saw "Ed" get drugs from his (Carver's) mother, Sandra Dailey. (Tr. 152-153.)
The defense theory of the case was based upon appellant's contention that he was not in the home of Ms. Dailey, a home which was frequented by those buying drugs from her. Defense counsel suggested that appellant's brother Phillip may have been the actual perpetrator, if there actually was a crime committed. Counsel also suggested that the two families had a long history of troubles between them.
Appellant's first witness was his father, Robbie Lee Papalevich. According to Mr. Papalevich, appellant was at home, sleeping on the floor, when the alleged crime took place at Ms. Dailey's house.
Phillip Ray Trent, age 16 at the time of trial, testified on behalf of appellant, his brother. He testified that he had bought drugs from Sandra Dailey "ever since [he] was about 13." According to Phillip, he had seen Jimmy "JJ" Carver, Dailey's son, doing drugs in the past, contrary to JJ's earlier testimony. For quite awhile, Phillip saw Carver doing drugs often, "usually every time [Phillip] went over to [Dailey's] house * * * every other day." Phillip acknowledged that he himself had been in treatment for drug problems. (Tr. 165-167.)
Appellant testified on his own behalf. He testified that he was at his father's house at the time of the alleged break-in at Sandra Dailey's home. Appellant denied ever owning or even possessing a firearm.
Appellant explained his relationship with Jimmy Lee ("JJ") Carver, whom he had known since kindergarten. The two of them had an "argument in school" back in 1992 or 1993, and later "had a fight there in front of his home." (Tr. 175-176.)
Under cross-examination, appellant acknowledged that he had previously been charged with "disorderly conduct, jaywalking and intoxication." The record also suggests that he was charged with resisting arrest as well.
Notwithstanding the state's confessed error as to certain sentencing issues raised by appellant's second and fifth assignments of error, we do not reach such issues. Appellant's third and fourth assignments of error raise interrelated issues which are ultimately dispositive of this appeal.
In his third assignment of error, appellant argues that the trial court committed reversible error in allowing an incompetent person, Sam Swanson, to testify. In a related vein, appellant's fourth assignment of error challenges the trial court's action in giving the deliberating jury a portion of the testimony of "key witness" Sam Swanson.
Evid.R. 601(A) provides:
Every person is competent to be a witness except:
 (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly.
In addition to being competent, Evid.R. 603 requires that "* * * every witness * * * declare that he will testify truthfully, by oath or affirmation administered in a form calculated to awaken his conscience and impress his mind with his duty to do so." In other words, a witness must understand the significance of, and potential ramifications involved in, taking an oath and testifying.
The vast majority of case law examining competency issues involve young children. In contrast, here we are faced with an adult witness of "unsound mind." However, the same underlying rationale and inquiry applies to both children and those of unsound mind. Indeed, a reading of Mr. Swanson's testimony reveals a witness who is very much "child-like" in his manner of thinking and answering questions. In fact, the trial court granted the prosecution "wide latitude" in asking questions which were remarkably leading, much akin to the common treatment of child witnesses.
In State v. Clark (1994), 71 Ohio St.3d 466, the Supreme Court of Ohio, explained that while Evid.R. 601(A) operates to "presume" the competence of persons ten years of age or older, that presumption "* * * recedes in those cases where a witness is either of unsound mind or under the age of ten." Id. at 469. Significantly, the court added:
 In such cases, the burden falls on the proponent of the witness to establish that the witness exhibits certain indicia of competency. [Id.; emphasis added.]
The Clark court then follows the test for determining competency as enunciated in State v. Frazier (1991), 61 Ohio St.3d 247 . Although Clark and Frazier involve potentially incompetent child witnesses, the same test applies with equal force to those of unsound mind:
 There [in Frazier] we held that in determining whether a child under ten is competent to testify, the trial court must take into consideration: the child's ability to receive accurate impressions of fact, the child's ability to recollect those impressions, the child's ability to communicate what is observed, the child's understanding of truth and falsity, and the child's appreciation of his or her responsibility to tell the truth. * * * [Clark at 469.]
The Clark court repeatedly emphasizes that the "proponent of the witness's testimony bears the burden of proving that the witness is capable of receiving just impressions and relating them truthfully." Id. at 469.
The state does not address, nor did the trial court appear to acknowledge, the burden placed upon the prosecution as the proponent of Mr. Swanson's testimony; instead, the state concentrates on the abuse-of-discretion standard of review by which we are bound.
We recognize that appellate courts must give due deference to a trial court's determination of competency. "A trial judge, being in the best position to view and hear a witness and being in the best position to determine the witness' understanding of the events in question and his understanding of the nature of an oath, is to be given wide discretion in determining that witness' competence to testify." State v. Bradley (1989), 42 Ohio St.3d 136, paragraph one of the syllabus. Notwithstanding this relatively rigorous standard of review, however, the trial judge's determination is not unassailable. It is our obligation to determine whether such an abuse of discretion did indeed occur.
At the beginning of his direct examination by the prosecution, Mr. Swanson gave his name as "Sammy," and his age as 35. He had "no idea" if he went to a middle school or junior high, but claimed to recall graduating from high school in "'96, I think. I think so. I'm not sure." When asked if he worked anywhere, Mr. Swanson responded, "No, just my job," referring to the Florentine restaurant. According to Mr. Swanson, he works as a dishwasher and "bread-baker." (Tr. 76-78; emphasis added.) Following this exchange, defense counsel requested a sidebar during which he moved for a declaration that Mr. Swanson was incompetent to testify. During the sidebar, as the jury stayed in the courtroom, the trial judge stated to counsel:
 For the record, six months ago we began this case and Mr. Swanson testified at that time. There is no question that he has a diminished mental capacity, but I don't think that is educationally. It is not from any obvious defects. He functions dailey [sic] in a job. He's not the brightest bulb in the pack, but by the same token, I have no reason to believe that he is incompetent at this point. * * * I would like to talk to him.
* * *
 * * * Bring him in here very quickly and I'll ask several questions. [Tr. 80-81; emphasis added.]
The judge's "very quick" inquiry into this critical issue comprises less than five pages of transcript. The colloquy between the judge and Mr. Swanson included the following substantive discussion:
THE COURT: Now, you're 35 years old?
THE WITNESS: Yes, sir.
 THE COURT: When did you graduate from high school? Did you graduate?
THE WITNESS: Yes, I did.
THE COURT: Do you remember what year you graduated?
THE WITNESS: I have no idea, to be honest.
 THE COURT: All right. Do you know what year it is now? What year is this?
THE WITNESS: It's 2000.
THE COURT: Okay. And what day of the week is it?
THE WITNESS: What day I graduated?
THE COURT: No. What day of the week is today?
THE WITNESS: Friday.
* * *
THE COURT: All right. How many days a week do you work?
THE WITNESS: I work Monday through Friday doubles.
THE COURT: You work double shifts?
THE WITNESS: Yes.
 THE COURT: Good for you. What holiday is coming up? Do you understand my question?
THE WITNESS: Yes, sir.
 THE COURT: What day is Monday going to be, this coming Monday?
THE WITNESS: It is a holiday.
 THE COURT: What is it? What month are we in? What month is this?
 THE WITNESS: I got this I can't talk this much. I'm a slow studderer [sic]. I can't talk that much.
THE COURT: Do you know what month it is?
THE WITNESS: It is December.
 THE COURT: All right. So if today is the 22nd of December, what day is Monday?
What holiday is Monday?
Do you believe in Santa Claus?
THE WITNESS: Yes, sir.
 THE COURT: Okay. What date does Santa Claus come? Do you recognize it as Christmas?
 THE WITNESS: Yeah, Christmas. I can't say that because I have got a little studder [sic] most times.
THE COURT: Okay. You graduated from high school?
THE WITNESS: Yes, sir.
THE COURT: Can you read and write?
THE WITNESS: I can read and write.
* * *
 THE COURT: Do you know this gentleman's name [indicating prosecuting attorney]? Do you know who he is?
THE WITNESS: He's my lawyer.
* * *
 THE COURT: Well, actually he is the lawyer for the state of Ohio, but he has called you as his witness. Okay.
 Do you know what role he [defense counsel] has in this case?
Who is this gentleman?
THE WITNESS: I don't know him.
THE COURT: Okay. Do you know who he represents?
THE WITNESS: Who?
THE COURT: Do you remember meeting him before?
THE WITNESS: Yeah, I met him before.
THE COURT: You recognize that we have done this before?
THE WITNESS: Yes, I do.
 THE COURT: Okay. You recognize that he represents Mr. Papalevich?
THE WITNESS: Yes, sir.
THE COURT: What is my role?
 THE WITNESS: You're the judge. You ask all the questions.
 THE COURT: Well, I'm asking all the questions right now. But normally the lawyers ask questions.
THE WITNESS: Yeah.
THE COURT: Thank you.
Let's proceed.
* * *
 THE COURT: Okay. Do you understand the difference between the truth and telling a lie?
THE WITNESS: I always tell the truth always.
 THE COURT: What happens if you don't tell the truth in a court of law?
THE WITNESS: I will be in trouble.
THE COURT: Okay.
THE WITNESS: Big trouble.
THE COURT: Okay.
THE WITNESS: I always tell the truth.
 THE COURT: You have taken an oath to tell the truth today, correct?
THE WITNESS: Yes, I did. I will tell the truth.
 THE COURT: No one has told you to do anything other than that, correct?
THE WITNESS: No, sir. [Tr. 82-87; emphasis added.]
And with that final remark, the trial court summarily overruled the motion. No substantive foundational questions were offered by the prosecution. Not one predicate question pertained to the issues involved in the case, contrary to the law on the issue. Many questions which were answered remotely correctly by Mr. Swanson read as though the answers were virtually "spoon-fed," unwittingly or otherwise, by the judge. No doubt exists that this witness answered these extremely benign questions in a purely child-like manner.
The trial judge aptly noted the obvious at the initiation of defense counsel's motion that Mr. Swanson "has a diminished mental capacity." That observation is blatantly apparent from the above conversation between the judge and Mr. Swanson, in addition to Swanson's testimony on both direct and cross-examination. Also apparent from Swanson's testimony is that he is highly susceptible to leading questions, which, again, served only to aggravate the problem.
The state correctly points out that "[s]howing the witness to be of unsound mind does not automatically render him incompetent to testify." Bradley at 140. Quoting State v. Wildman (1945), 145 Ohio St. 379, paragraph three of the syllabus, the Bradley court followed this rule:
 "A person, who is able to correctly state matters which have come within his perception with respect to the issues involved and appreciates the nature and obligation of an oath, is a competent witness notwithstanding some unsoundness of mind." [Bradley, supra, at 140-141; emphasis added.]
As discussed above, not one single inquiry was made of this apparently incompetent witness about "the issues involved" in the case. In light of the foregoing, we must conclude that the trial court abused its discretion in finding Mr. Swanson to be competent. To be more precise, the trial court was required to find that the state, the proponent of the challenged witness, met its burden of demonstrating the competence of Mr. Swanson. The trial court required virtually nothing from the prosecution in this respect.
In sum, although the trial court acknowledged some degree of "unsoundness" on the part of Mr. Swanson, the trial court's "very quick" inquiry into Mr. Swanson's competency failed to satisfy both the obligation borne by the court and the burden placed upon the proponent of the challenged testimony to establish the witness's competence to testify.
Moreover, we cannot deem the allowance of Mr. Swanson's testimony as harmless error. The record before us supports appellant's assertion that he was clearly prejudiced by Swanson's testimony. Throughout their protracted deliberations, the jurors obviously struggled, asking at least four separate questions.
Ultimately, the jury, after deliberating many hours over several days, was given a charge pursuant to State v. Howard (1989), 42 Ohio St.3d 18, when it became apparent they indicated they were deadlocked. After receiving the Howard charge, which effectively suggests to the jurors that the court is not inclined to accept a hung jury and urges jurors to resolve the case as is their duty, the jury continued to send questions to the trial judge. Finally, the jury returned its guilty verdicts relatively soon after receiving a partial transcript of Mr. Swanson's testimony. While providing such documentation to a jury may not be per se erroneous, giving this jury a portion of this incompetent witness's testimony only served to exacerbate the error in allowing him to testify.
With respect to providing a transcript of Mr. Swanson's testimony, the trial judge stated, "Normally I tell them to rely on their collective memory. If I do that, they will hang." (Tr. 255; emphasis added.) This comment evinces the judge's unwillingness to accept a hung jury at any cost.
We cannot simply "disregard" Mr. Swanson's testimony; it is crucially linked to Ms. Dailey's testimony and the state's entire case. In the words of appellant's counsel, Mr. Swanson was indeed a "key witness." Indeed, as discussed infra, Mr. Swanson was the only witness presented by the state who purportedly saw the alleged perpetrator or perpetrators. Again, according to Ms. Dailey, she only recognized a voice which she believed to be appellant's.
The evidence presented by the state in its case-in-chief was minimal at best. The state acknowledges the importance of Mr. Swanson's testimony by acknowledging that "[a]ppellant was acquitted of both counts of aggravated robbery and all the firearm specifications. He was also found not guilty of the aggravated burglary charge. These charges were hinged almost entirely on Swanson's testimony." (Brief at 15-16; emphasis added.) With respect to the kidnapping convictions in particular, the prosecution further remarks, "Even if the robbery and kidnapping of Ms. Dailey were insufficient to justify convictions, there is sufficient evidence in this record to support a finding that the movement of Sam Swanson went far beyond that necessary to commit a robbery." (Id. at 12.)
Read in its entirety, the transcript reveals the unreliability of any convictions even remotely supported by Mr. Swanson's suspect testimony. Moreover, the state of this record and the extremely limited evidence therein, particularly considered in the absence of Swanson's testimony, does not lend reliability to the convictions arising directly from Ms. Dailey's testimony.
In addition, as noted by appellant's counsel, the prosecution further exacerbated the precarious nature of Mr. Swanson's testimony by effectively "vouching" for his credibility. During closing argument, the prosecution attempted to bolster Mr. Swanson's credibility. Vouching for the credibility of one's witness is improper. State v. Carpenter (1996), 116 Ohio App.3d 615 . "[W]hile a prosecutor is free to argue that certain evidence tends to make a witness more or less credible, State v. Watson (1991), 61 Ohio St.3d 1, 10 * * *, he may not state his own belief as to whether a witness is telling the truth." Carpenter at 624. (Citations omitted).
Given the foregoing, the third and fourth assignments of error are sustained. Because the necessary remedy on remand is a new trial, appellant's remaining assignments of error are moot. However, given our disposition of the competency issue, any new trial wherein the state plans to present testimony of Mr. Swanson, a full hearing on his competency at that time will be required in accordance with the law and analysis set forth infra.
Having sustained the third and fourth assignments of error, the judgment of the trial court is reversed and this cause is remanded for a new trial consistent with this opinion.
Judgment reversed and cause remanded.
[1] Various portions of the record indicate appellant's year of birth as either 1980 or 1981.
KENNEDY, J., concurs.
BROWN, J., dissents.